[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1165 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1166 
Dr. Suzanne Vaughan and Birmingham Radiological Group-MCE, P.C.[1]
("the Group"), appeal the judgment of the trial court entered on the jury verdict of $500,000 in past damages and $2,000,000 in future damages against them and in favor of the plaintiff Karen Oliver. We affirm in part, reverse in part, and remand with instructions.
Karen Oliver sued Dr. Vaughan and the Group[2] for failing timely to recognize and timely to notify Oliver's treating physicians of the malposition of a central venous catheter and thereby proximately causing a thrombosis in, and the amputation of, Oliver's right-dominant arm below the elbow. The case was tried to a jury. At the close of the presentation of Oliver's evidence, Dr. Vaughan and the Group moved to exclude the testimony of Oliver's expert radiologist Dr. Bruce Rodan and further moved for a judgment as a matter of law, which the trial court denied. At the close of all the evidence, Dr. Vaughan and the Group again moved for a judgment as a matter of law, which the trial court denied. The jury returned a verdict in favor of Oliver and against Dr. Vaughan and the Group for $500,000 in past damages and $2,000,000 in future damages. The trial court entered judgment on the jury's verdict. Dr. Vaughan and the Group again moved for a judgment as a matter of law and moved, in the alternative, for a new trial, or for a remittitur. They also moved to alter, to amend, or to vacate the judgment to comply with § 6-5-543(b), Ala. Code 1975. The trial court denied all of the motions.
Vaughan and the Group appeal. On appeal, Dr. Vaughan and the Group raise three issues: (1) whether the trial court erred in denying their motions for a judgment as a matter of law, (2) whether the trial court erred in denying their motion for a new trial, and (3) whether the trial court erred in refusing to amend the judgment *Page 1167 
to conform to § 6-5-543(b), Ala. Code 1975.
On March 23, 1995, suffering from bilateral pneumonia, Oliver was admitted to the intensive care unit of Medical Center East ("MCE"). During the morning of March 25, 1995, Oliver's treating physician ordered the placement of a central venous catheter in Oliver's neck. A central venous catheter or central venous line is used to infuse medications and fluids directly into the bloodstream. Dr. Barry Martin, an anesthesiologist, placed the catheter in the left side of Oliver's neck at 8:15 a.m. The placement of a catheter is a "blind" placement because the doctor performing the procedure cannot see the artery or blood vessel into which the catheter is inserted or the direction the catheter moves as it is threaded toward the superior vena cava. The doctor's goal is to thread the tip of the catheter into the superior vena cava and to avoid threading the catheter into the patient's aorta, the main blood vessel that conveys blood from the heart. When a catheter is properly placed, the tip of the catheter is located in the superior vena cava, the main vein that drains blood from the arms, chest, and brain, and conducts it into the atrium of the heart.
The malposition or misplacement of a catheter is a well-known complication of a catheter placement. The placement of a catheter must be verified before any medications can be infused through the line. While the placement of a catheter is checked by X-raying the patient's chest, neither the superior vena cava nor the aorta is visible in an X-ray.
Dr. Martin testified that he ordered a "stat" (immediate) portable chest X-ray to verify the placement of Oliver's catheter and that he relied on the radiologist on duty and the nurses to inform him of any problems with the placement. At 9:45 a.m., two radiographers X-rayed Oliver's chest. Oliver's X-ray was developed about 10:00 a.m.
Dr. Suzanne Vaughan was the radiologist on duty on March 25, 1995. Elisa Byrd, a radiographer at MCE, unsuccessfully attempted to locate Dr. Vaughan to read Oliver's X-ray. Following normal procedure, Byrd then took Oliver's X-ray to an emergency-room doctor, Dr. Bryan Woodward III, to verify placement of Oliver's catheter. Dr. Woodward verified the placement of the catheter as proper and Byrd telephoned the intensive care nurses' station to report the verification. Nurse Renee Brantley noted in Oliver's medical chart that an emergency-room doctor had verified placement. Brantley did not note the name of the emergency-room doctor or the time of the verification. Brantley testified that the nurses then began using the catheter to infuse medications and fluids.
Pursuant to hospital policy requiring a radiologist to "overread" an X-ray that had been read by a doctor other than a radiologist, Byrd then took Oliver's X-ray to the radiology department and hung the X-ray on a light screen, to be reviewed by Dr. Vaughan. Dr. Vaughan did not read Oliver's first X-ray until 9:00 p.m. on March 25, 1995, 11 hours after the X-ray was developed. About 10:00 p.m. Dr. Vaughan dictated her report into a "radiology hotline" that anyone in the hospital can access by telephone. She reported that the catheter "is a little more to the left than is usually seen when it is in the superior vena cava." Dr. Vaughan did not state whether Oliver's catheter was properly or improperly placed.
Oliver's chest was X-rayed a second time at 6:00 a.m. on March 26, 1995. Dr. Vaughan reviewed that X-ray and reported, "Endotracheal tube, NG tube, and central venous catheter remain." *Page 1168 
Before 10:30 a.m., Nurse Brantley reported that Oliver's right arm was cold and was without a pulse. At 11:40 a.m., Oliver's chest was X-rayed a third time. Dr. Vaughan reviewed Oliver's X-ray and reported, "Endotracheal tube and NG tube as well as central venous catheter remain in position. The tip of the central venous catheter is in the midline at approximate the T7 level and I cannot exclude this being in the aorta."
Thereafter, in cooperation with one of Oliver's treating physicians, Dr. Vaughan performed a contrast study by injecting dye into Oliver's catheter and X-raying Oliver's chest. After reviewing this X-ray, Dr. Vaughan reported, "The catheter is in the ascending aorta." She opined that the catheter was malpositioned. Dr. Martin was notified of the malposition. He removed the catheter and inserted another catheter in Oliver's right jugular vein.
Oliver developed a thrombosis in her right arm. On April 4, 1995, doctors amputated Oliver's right arm below the elbow. Oliver's dominant hand was her right hand. On May 15, 1995, doctors discharged Oliver from the hospital.
Oliver underwent rehabilitation in a hospital in Louisiana near her parents. After her discharge, because of her need for constant care and help, Oliver and her son lived with her parents for one year. Oliver trained herself to write with her left hand. At the time of trial, Oliver was attending college and was pursuing a degree in social work. She had difficulty driving, finding clothes that fit, and caring for herself and her son. Oliver testified that while in the hospital she felt she had pain in that part of her arm that had been amputated.
The parties stipulated to the amount and reasonableness of Oliver's medical expenses of $369,908.12, to payments of $305,122.66 by Oliver's health-care plans for her medical expenses, to the write-off or cancellation of the remainder of the medical expenses, and to Oliver's obligation to repay the $305,122.66 to her health-care plans if the jury returned a verdict in favor of Oliver.
 I. Motions for Judgment as a Matter of Law
"A judgment as a matter of law is proper only where there is a complete absence of proof on a material issue or where there are no controverted questions of fact on which reasonable people could differ and the moving party is entitled to [a] judgment as a matter of law." Locklear DodgeCity, Inc. v. Kimbrell, 703 So.2d 303, 304 (Ala. 1997) (internal quotation marks omitted). "[I]n reviewing the record to determine whether a trial court properly [granted a judgment as a matter of law], we `must view all the evidence in a light most favorable to the nonmovant and must entertain such reasonable evidentiary inferences as the jury would be free to draw.' Renfro v. Georgia Power Co., 604 So.2d 408, 411 (Ala. 1992)." Gewin v. TCF Asset Mgmt. Corp., 668 So.2d 523, 526 (Ala. 1995).
In medical-malpractice cases, "[t]he plaintiff must prove the alleged negligence through expert testimony, unless an understanding of the alleged lack of due care or skill requires only common knowledge or experience." McAfee v. Baptist Med. Ctr., 641 So.2d 265, 267 (Ala. 1994). Further, "[i]n medical malpractice cases, the plaintiff must prove that the alleged negligence `probably caused the injury.'" McAfee, 641 So.2d at 267. "To prove causation in a medical malpractice case, the plaintiff must prove, through expert testimony, that the alleged negligence probably caused, rather than only possibly caused, the plaintiff's injury." University of Alabama Health Servs. Found., P.C. v. *Page 1169 Bush, 638 So.2d 794, 802 (Ala. 1994) (emphasis added).
Dr. Vaughan and the Group argue that the trial court erred in denying their motions for a judgment as a matter of law because, they say, Oliver failed to offer substantial evidence that Dr. Vaughan committed negligence — that is, that she breached the standard of care. Specifically, Dr. Vaughan and the Group argue that "[t]he trial court erred in this case in refusing to exclude the expert opinion testimony of Dr. Bruce Alan Rodan," Oliver's expert radiologist, who testified to applicable standard of care and to Dr. Vaughan's breach of that standard of care.
First, we note that neither Dr. Vaughan nor the Group timely objected either to Dr. Rodan's qualifications as a similarly situated health-care provider or to his testimony. "An objection must be made and a ground stated therefor or the objection and error are deemed to have been waived." Costarides v. Miller, 374 So.2d 1335, 1337 (Ala. 1979). Seealso HealthTrust, Inc. v. Cantrell, 689 So.2d 822, 825-26 (Ala. 1997). "Objections must be `raised at the point during trial when the offering of improper evidence is clear,' see Charles W. Gamble, McElroy's AlabamaEvidence § 426.01(3) (5th ed. 1996)." HealthTrust, 689 So.2d at 826. Dr. Vaughan and the Group did not challenge Dr. Rodan's qualifications as a similarly situated health-care provider until the close of the plaintiff's evidence. Consequently, their challenge was untimely and was waived. HealthTrust, supra, and Paragon Eng'g, Inc. v. Rhodes,451 So.2d 274, 277 (Ala. 1984).
Moreover, their challenge to Dr. Rodan's qualifications is without merit. Section 6-5-548(c), Ala. Code 1975, requires that a board-certified expert meet all of the following requirements:
 "(1) Is licensed by the appropriate regulatory board or agency of this or some other state.
 "(2) Is trained and experienced in the same specialty.
 "(3) Is certified by an appropriate American board in the same specialty.
 "(4) Has practiced in this specialty during the year preceding the date that the alleged breach of the standard of care occurred."
Both Dr. Vaughan and Dr. Rodan are licensed, board-certified radiologists, certified by the American College of Radiology. They have the same training and experience. Although Dr. Rodan did not work in a hospital during the year preceding the alleged negligence, Dr. Rodan did have his own private practice, which included reading X-rays. Section6-5-548(c) does not require that a similarly situated health-care provider work in the same work environment as the provider accused of error. We rejected the notion of such a requirement in Dowdy v. Lewis,612 So.2d 1149 (Ala. 1992). Thus, the trial court did not err in admitting Dr. Rodan's testimony, which established duty and breach.
Next, Dr. Vaughan and the Group contend that the trial court erred in denying their motions for judgment as a matter of law because, they say, Oliver did not present substantial evidence that Dr. Vaughan's negligence proximately caused her injury. Specifically, they argue that Oliver did not present any evidence that Dr. Vaughan's delay in diagnosing the malpositioning of Oliver's catheter probably caused Oliver to lose her right arm below the elbow. Oliver contends that she did present substantial evidence that Dr. Vaughan's delay in diagnosing the malpositioning of the catheter caused her to lose her arm. Oliver asserts that Dr. Alan Perry, a vascular surgeon who amputated Oliver's right hand and arm, testified by *Page 1170 
deposition that Oliver's arm "was `probably' salvageable up until 10:30 a.m. on the 26th of March, roughly 13 hours after Vaughan reviewed the [first] X-ray (25 hours after she should have read it). (Deposition of Perry at p. 20)." Brief, p. 16. See also counsel's reference to Dr. Perry on R. 771. Although the depositions of Dr. Perry, who was Oliver's vascular surgeon, and Dr. Sullivan, who was Oliver's admitting and main treating physician, were read to the jury, the court reporter did not transcribe the in-court reading of the deposition testimony of either doctor. No party admitted the depositions themselves into evidence or filed the depositions with the court. Therefore, the jury and the trial court had evidence before them not included in the record on appeal. "Where all the evidence is not in the record, it will be presumed that the evidence was sufficient to sustain the verdict or judgment."Berryhill v. Mutual of Omaha Ins. Co., 479 So.2d 1250, 1251 (Ala. 1985).See also Smith v. Smith, 596 So.2d 1 (Ala. 1992); Eubanks Eubanks,Inc. v. Colonial Pacific Leasing, 757 So.2d 437 (Ala.Civ.App. 1999);Cofer v. Town of Good Hope, 655 So.2d 1028 (Ala.Civ.App. 1995); Jones v.Jones, 603 So.2d 1109 (Ala.Civ.App. 1992). Therefore, we presume that the evidence was sufficient to sustain the denial of the motions for judgment as a matter of law.
 II. Motion for a New Trial
"In reviewing a jury verdict, an appellate court must consider the evidence in the light most favorable to the prevailing party . . . ."Delchamps, Inc. v. Bryant, 738 So.2d 824, 831 (Ala. 1999). See also Cobbv. MacMillan Bloedel, Inc., 604 So.2d 344 (Ala. 1992), and Mason Dixon Lines, Inc. v. Byrd, 601 So.2d 68 (Ala. 1992). A presumption of correctness attaches to a jury verdict, "if the verdict passes the `sufficiency test' presented by motions for a directed verdict and a JNOV." S W Properties, Inc. v. American Motorists Ins. Co.,668 So.2d 529, 534 (Ala. 1995). (Rule 50(a), Ala.R.Civ.P., now designates a motion for a directed verdict as a motion for a judgment as a matter of law, and Rule 50(b) now designates a motion for JNOV as a renewed motion for a judgment as a matter of law.) This presumption is strengthened by the denial of a motion for a new trial. Christiansen v. Hall,567 So.2d 1338 (Ala. 1990). "This Court will not, on a sufficiency of the evidence basis, reverse a judgment based on a jury verdict unless the evidence, when viewed in a light most favorable to the [verdict-winner], shows that the verdict was `plainly and palpably wrong and unjust.'" S W Properties, 668 So.2d at 534 (quoting Christiansen, 567 So.2d at 1341). "Whether to grant or deny a motion for new trial rests within the sound discretion of the trial court, and this Court will not reverse a ruling in that regard unless it finds that the trial court's ruling constituted an abuse of that discretion." Colbert County-NorthwestAlabama Healthcare Auth. v. Nix, 678 So.2d 719, 722 (Ala. 1995). "Without a showing of such an abuse, the trial court's ruling must be affirmed."Id.
 A. Admission of Expert Testimony
Dr. Vaughan and the Group assert that they are entitled to a new trial because, they again say, the trial court erred in admitting the testimony of Dr. Rodan. For the reasons previously stated, this contention is without merit.
Next, they claim that the trial court erred "in allowing Dr. Barry Kraynack [Oliver's expert anesthesiologist] to offer testimony regarding the standard of care applicable to Dr. Vaughan." Brief, p. 19. Dr. Kraynack's testimony now challenged by Dr. Vaughan and the Group follows:
"Q. All these other notes have a time? *Page 1171 
 "A. Right. This does not. I have no idea of who wrote it, where, when, and as to what it is referring to, who.
 "Q. Thank you Doctor. And, Doctor, all of your answers to Mr. Florie's [the lawyer representing the anesthesiologist Dr. Martin] lengthy questions concerning ER doctor and the nurses, Ms. Byrd, Ms. Brantley, etc., etc. are based on this note being a truthful note, correct?
"A. Yes.
 "Q. And if, in fact, this note is not accurate, not truthful, then all of your answers to those questions would be different, wouldn't they?
"A. Yes.
 "Q. Mr. Florie asked you for about, I don't know, maybe 30 or 40 minutes, questions about the blood color, the pulsatile nature of the blood. And maybe I missed it, but I understood on your direct examination with me that you said you have no criticism of [D]r. Martin [the anesthesiologist] for that?
"A. No.
 "Q. I wasn't sure, it went on for so long. Now, I think that there was some confusion, too, let me ask you, there was a whole host of questions by Mr. Florie about what the hospital did or the personnel of the hospital, these doctors' policy or procedure. Is that the standard of care?
"A. No, it is not.
"Q. All right. Is that the national standard of care?
"A. No.
"Q. Is the standard of care a national standard?
"A. Yes, there is a national standard.
 "Q. All right. And what these doctors or this hospital was doing —
 "MR. CLECKLER [the lawyer for MCE]: Again, we object, the hospital. He's not here to testify as an expert against the hospital. She knows that.
"THE COURT: Overruled.
 "MS. SHAW [one of Oliver's lawyers]: If what a doctor —
 "MR. CHRISTIAN [the lawyer for Dr. Vaughan and the Group]: We'd object to what the doctors, Your Honor.
"THE COURT: All right. Overruled.
 "Q. Let me back up. If the policy or procedure or protocol, whatever these doctors were doing, was relying on radiology and the nurses to call, does that comport with the standard of care on a national basis?
 "MR. CHRISTIAN: I object, Your Honor. She's talking about Dr. Vaughan. It's not been shown that he's qualified under the law of Alabama as a similarly situated health-care provider to testify against Dr. Vaughan.
"MR. CLECKLER: Or to the nurses.
"THE COURT: Overruled.
 "MS. SHAW: I wasn't saying anything about the nurses, Judge.
"THE COURT: Overruled.
"A. I did.
"Q. What was your answer?
 "A. That it's not the standard of care that's being followed here.
 "Q. So, all of your answers to the litany of questions by Mr. Florie —
 "MR. FLORIE: I object to her characterization repeatedly.
 "Q. All of your answers to questions by Mr. Florie concerning policy or what was being done at that hospital have nothing to do with the standard of care?
"A. No.
 "Q. And were you simply answering or agreeing with him saying that's what they were doing?
 "A. He was giving me a list of suppositions, yes, that can be. But that's not *Page 1172 
 what the standard is or how we need to function taking care of placement of the line.
 "Q. Okay. Let me look right quick, too, at one of Dr. Vaughan's reports. Let me show you again. Let me make sure we're clear. This is a report from the morning of the 25th reported by Dr. Vaughan, can you see that?
"A. Yes.
 "Q. Okay. Where she says central venous catheter tip is a little more to the left than usually seen. Do you see that?
"A. Yes.
 "Q. If Dr. Vaughan had read that report to you, what would you have done?
"A. I would have come in and —
"THE COURT: Wait just a moment.
"MS. SHAW: Go ahead.
"MR. FLORIE: Object to what he would have done.
"MR. CHRISTIAN: I object also, Your Honor.
"THE COURT: Sustained.
 "Q. Well, I'll go on. What does this report, in your field of anesthesiology, if you get this report and read this, does that say to you the central venous line is properly placed or not?
"A. No.
 "MR. CHRISTIAN: Object. He hasn't been qualified to testify, and he's now testifying against Dr. Vaughan. And the law in this state requires that he be board certified in radiology in order to do that, and he is not. And we object to it and move to exclude any answer that he gives.
"THE COURT: Overruled.
"Q. Doctor, do you ever dictate into a machine of any sort.
"A. Yes, quite often.
 "Q. And did you see in the depositions here that you read in this case that there was a hotline at the hospital.
"A. Yes." (R. 380-83.) (Emphasis added.)
In this exchange Dr. Kraynack, Oliver's expert anesthesiologist, answered only two questions challenged by objections. Only one of the objections was timely. We will repeat these particular parts of the exchange in order:
 "Q. Let me back up. If the policy or procedure or protocol, whatever these doctors were doing, was relying on radiology and the nurses to call, does that comport with the standard of care on a national basis?
 "MR. CHRISTIAN: I object, Your Honor. She's talking about Dr. Vaughan. It's not been shown that he's qualified under the law of Alabama as a similarly situated health-care provider to testify against Dr. Vaughan.
". . . .
"A. I did.
". . . .
 "Q. Well, I'll go on. What does this report, in your field of anesthesiology, if you get this report and read this, does that say to you the central venous line is properly placed or not?
"A. No.
 "MR. CHRISTIAN: Object. He hasn't been qualified to testify, and he's now testifying against Dr. Vaughan. And the law in this state requires that he be board certified in radiology in order to do that, and he is not. And we object to it and move to exclude any answer that he gives."
The answer "I did" in response to the question challenged by timely objection is so unresponsive and cryptic that it conveys no information at all. Thus, it could not be a source of prejudice *Page 1173 
sufficient to warrant reversal. Rule 45, Ala.R.App.P. The only other objection to an answered question followed the answer. Because it was tardy, it was ineffective. Crowne Investments, Inc. v. Reid, 740 So.2d 400,408 (Ala. 1999).
Moreover, Dr. Kraynack's entire testimony reveals that he, as an anesthesiologist expert, was criticizing only the anesthesiologist Dr. Martin for failing to review Oliver's X-rays, for depending on the nurses and Dr. Vaughan to tell him of any problems, and for failing to get and to heed Dr. Vaughan's reports. Even Dr. Martin admitted that Dr. Vaughan's very first report was a "red flag." Dr. Martin admitted that, had he known of Dr. Vaughan's report, he would have checked the catheter.
The remedy of a party for the introduction of evidence inadmissible against that particular party but admissible against another in the same trial is a limiting instruction. That is, the aggrieved party may request, whereupon the trial court must give, an instruction to the effect that the evidence may be considered only against the appropriate party. Rule 105, Ala. R. Evid. See Mason v. New, 475 So.2d 854 (Ala. 1985). Neither Dr. Vaughan nor the Group requested a limiting instruction to protect them from any adverse implications of this particular testimony by the expert witness anesthesiologist Dr. Kraynack against the defendant anesthesiologist Dr. Martin. Thus, neither Dr. Vaughan nor the Group can complain of any such incidental prejudice. See Campbell v.Employers Ins. Co. of Alabama, 521 So.2d 924 (Ala. 1988), and Mobile CityLines, Inc. v. Proctor, 272 Ala. 217, 130 So.2d 388 (1961). Accordingly, the trial court did not err in admitting Dr. Kraynack's testimony.
 B. Weight of the Evidence
Dr. Vaughan and the Group contend that they are entitled to a new trial because, they say, the jury verdict "is contrary to the great weight and preponderance of the evidence." They first depend on their previous arguments that the trial court erred by not excluding the testimony of Dr. Rodan. As we have already explained, those arguments are without merit. Dr. Vaughan and the Group next argue that Dr. Rodan did not testify to the applicable standard of care. As previously observed, Dr. Rodan did testify to the applicable standard of care. Here is the testimony:
 "Q. Okay. Doctor, based on your training and experience and background and education, are you familiar with the standard of care of a board certified radiologist?
"A. Yes, I am.
"Q. Would you tell the jury what that standard is?
 "A. Well, the role of a radiologist is a consultant. And a referring physician usually orders an X-ray, and it's th[e] job of the radiologist to interpret those films accurately, on a timely basis, and then also provide a report back to that referring physician or representative on a timely basis as was deemed necessary, meaning if it's a routine prep chest X-ray for surgery next week, well, then he can dictate out a report assuming it's normal and wait for the report to get back to the doctor the next day. Whereas if it's a stat report from an intensive care unit looking for a question, that means immediate, then it should be interpreted immediately and the report conveyed back in a timely manner.
 "Q. Doctor, is that the same standard in Florida as in Alabama? *Page 1174 
"A. Right. That's a national standard of care.
"Q. Known all throughout the country?
"A. Yes.
". . . .
 "Q. Doctor, if a particular doctor, radiologist has a policy or practice to, instead of what you said, read in a timely and accurate fashion and report in a timely and accurate fashion, even though they do it that way, is that the standard of care? Does that make sense?
 "A. No. But if an individual doctor has their standard, certainly it does not supersede the national standard of care.
"Q. The national standard would be on top of that?
"A. That's correct.
"Q. And you have to adhere to that?
"A. Yes, you should.
 "Q. Okay. And, Doctor, the standard that you have alluded to that you say in your deposition it's not written down out there anywhere or anything like that, is it?
 "A. No, there isn't anything that's hard and fast that's written saying this what you must do, but there are guidelines that are published that tell you this is how you should do it.
"Q. Doctor, did you bring those with you?
"A. Yes, I did.
"Q. Okay. I'm going to mark it as the next exhibit.
"(Plaintiff's Exhibit Number 9 was marked for identification.)
 "Q. Let me show you what I've marked as Plaintiff's Exhibit 9. Is that a document you brought with you?
"A. Yes, it is.
"Q. Okay. All right. And, Doctor, what is that document?
 "A. Well, it's the ACR, which is the American College of Radiology standard for communication in diagnostic radiology.
 "Q. And did you bring that as some evidence of showing what the standard of care is?
"A. Yes, I did.
"Q. For a board-certified radiologist?
"A. Yes.
"Q. And doing what you said a while ago was the standard?
"A. Yes.
"Q. And that's not the standard written down, correct?
"A. That's correct.
 "Q. But some guidelines, and I'm sure there are others out there, aren't there?
"A. Other guidelines?
"Q. Yes.
"A. Not put out by the American College of Radiology.
"Q. Okay. What is the American College of Radiology?
 "A. It's sort of the governing group for all of the radiologists in the United States.
"Q. Okay. All right.
 "MS. SHAW: Judge, at this time we would offer Plaintiff's Exhibit 9.
"THE COURT: Admitted.
"(Plaintiff's Exhibit Number 9 was admitted Into evidence.)
 "Q. Doctor, based on [your] training and experience and your review of the record, X-rays and reports in this particular case, have you formed any opinions as to the conduct of Dr. Suzanne Vaughan?
"A. Yes, I have.
"Q. Would you tell the jury those opinions?
 "A. The opinion is that the radiographs were not interpreted on a timely basis *Page 1175 
 and the findings she found, even though she saw an abnormality, she did not realize the significance of them and did not convey the results to the treating physician in a timely manner.
 "Q. Okay. And do you have an opinion as to whether that would breach the standard of care?
"A. Yes, I believe it is a breach of the standard of care.
 "Q. And tell me again and make sure I understand, you said failed to appreciate the significance —
"MR. CHRISTIAN: We object, leading and repetitious.
"THE COURT: Sustained.
 "Q. Well, could you tell us, give us an outline of your opinion?
"MR. CHRISTIAN: Same objection, Your Honor, repetitious.
 "MS. SHAW: Judge, I need to follow up and flesh them out.
 "MR. CHRISTIAN: Same objection, Your Honor, it's repetitious. She already asked that question.
 "THE COURT: Overruled. Go on. Just get through with it.
"Q. What was you first opinion?
 "A. The opinion is that the films were not interpreted on a timely manner. The other was that the significance of the findings [was] not appreciated. And third, was that the failure to communicate the significant findings in a timely manner to the referring physician.
"Q. Okay. And which film are we talking about?
"A. The film on 3/25.
"Q. Okay. That's Plaintiff's Exhibit 7?
"A. Yes.
 "Q. And would you step down again and show the jury when you say that she failed to appreciate the significance of the findings, what do you see on that film? What is the finding?
 "MR. CHRISTIAN: Same objection, You Honor. Pointed out twice now.
"THE COURT: Overruled.
"A. I'll correlate it with the patient's report.
"Q. That would be great.
 "A. On the report here it's a portable chest on 3/25 at 0945 hours. Also on the report here it tells you what time the request was put into the computer, which I'm trying to find here. Time is at 8:51. So, basically the study was done just under one hour after it was ordered stat.
"Q. It is a stat order?
"A. Yes, right here, priority stat.
"Q. All right.
 "A. And the report says an endotracheal tube approximately four centimeters above the carina, NG, which is the nasogastric tube. It's in the stomach. The stomach is quite [distended] with gas. There is a central venous catheter, the tip of which is projected in the midline at the T6-7, and that's relating to the thoracic vertebral body at what level. Bilateral air space opacity show[s] interval worsening. That's what's going on in the lung. All the white you see in the lung is fluid in the lung instead of air.
 "So, the opinion was worsening of air space process, which could represent edema, pneumonia, or other air space filling process such as ARDS, which stands for Adult Respiratory Distress Syndrome. Central venous catheter tip is a little more to the left than is usually seen when it is in the superior vena cava. So, basically the observation that this catheter isn't where you would expect it to be in the superior vena cava is mentioning that it is more to the left *Page 1176 
 than what is usually seen. And therefore, it would be malpositioned or raise the question of its being malpositioned. And that is the significant finding that's on the radiograph, which was mentioned on report.
"Q. Okay. That's what you're critical of?
 "A. Yes. The observation was there, but the significance of the observation was not appreciated.
 "Q. All right. And you — let me ask you this. The report that corresponds with Plaintiff's Exhibit 7, the X-ray that was read, do you think the report accurately reflects what is seen on the X-ray?
"A. Yes, it does.
 "Q. Okay. So, you don't criticize Dr. Vaughan in what she put on her report?
"A. That's correct.
 "Q. Okay. All right. And you said something about the timeliness. What, if anything, are you critical of on that report or the timeliness of that?
 "A. Well, that chest X-ray was performed at 0945 hours, and I believe in reading through Dr. Vaughan's deposition where she stated she read the film at 9:00 o'clock at night, which would be 11 hours later.
 "Q. Okay. And do you have an opinion as to whether that was a breach of the standard of care?
 "A. Well, I believe that stat radiograph should be interpreted by radiologists on a timely basis, yes.
"Q. Is that —
"A. Is that a breach?
"Q. Is it?
"A. Yes, it is.
 "Q. And when you say timely basis, you mean 10 to 12 hours is not timely?
 "A. That's correct. Even if the film was taken and then brought back up to the ICU where someone might review it, it could be brought back to the radiology department within a matter of an hour or two for the radiologist to review it as well.
 "Q. Okay. And then you said that there was also criticism in the failure to communicate. What would happen or what would do with that report?
 "A. Well, this report was dictated on 3/26/95. And I didn't see any notation in the chart which said that Dr. Vaughan, after she interpreted the film, notified the ICU nurse or any of the physicians involved in the case of her findings or question of the abnormal appearance of the catheter on the chest radiograph.
 "Q. Okay. And are you saying it was the standard of care for her to have so done?
"A. Yes.
"Q. You think she breached the standard?
"A. Yes, I do." (R. 412-20.)
Third, Dr. Vaughan and the Group argue that a finding of proximate causation is against the great weight of the evidence. As we have already explained, because the in-court reading of the depositions of Drs. Perry and Sullivan was not transcribed or otherwise included in the record, we presume that their testimony was sufficient to establish that Dr. Vaughan's delay in recognizing the malpositioning of the catheter proximately caused Oliver to lose her arm. Berryhill, Smith, Eubanks Eubanks, Cofer, and Jones, supra.
 C. Refusal of Jury Instruction Requested by Dr. Vaughan and the Group
Dr. Vaughan and the Group assert that their substantial rights were prejudiced by *Page 1177 
refusal of the trial court to give their requested jury instruction no. 4:
 "A physician does not guarantee the success of her treatment, and has fulfilled her duty to a patient if she prescribes a proper treatment, even though it does not produce good results. APJI 25.05"
Regarding physicians, the trial court instructed the jury:
 "Well, with respect to the physician, in performing professional services for a patient a physician must use such reasonable care, skill and diligence as physicians in the same general neighborhood and in the same general line of practice ordinarily have and exercise in a like case.
 "General neighborhood means the national medical neighborhood of reasonably competent physicians in the same line of practice, acting in the same or similar circumstances. And on the subject, still, and duties of a physician, let me instruct you that you have heard some evidence in the case concerning alternative methods of treatment. So if the defendant doctors in treatment of the plaintiff had available different or alternative methods of treatment and each of these methods was within the standard of care practiced by other physicians in the medical community, the mere fact that a bad result was obtained by use of a method employed by the defendant doctors cannot be a basis for imposing liability.
 "On the other hand, you may impose liability if you are reasonably satisfied by substantial evidence that the method employed by the defendants in the treatment of the plaintiff was below the applicable standard of care, or that the method selected was within the standard of care but the doctor was negligent or below the standard of care in carrying out that method." (Emphasis added.)
Dr. Vaughan and the Group objected to the refusal of the trial court to give their requested jury instruction by stating:
 "[W]e would respectfully except to the Court's failure to give our requested charges number 2, number 4, number 6, number 7, number 9, number 11, number 16, number 24, number 25, number 26, number 27, and number 28 on the grounds that they are correct statements of the law, that those charges are applicable to the facts in this case, and that those propositions were not adequately covered in the Court's oral charge."
Rule 51, Ala.R.Civ.P., provides, in pertinent part:
 "No party may assign as error the giving or failing to give a written instruction, or the giving of an erroneous, misleading, incomplete, or otherwise improper oral charge unless that party objects thereto before the jury retires to consider its verdict, stating the matter objected to and the grounds of the objection."
"`The ground that a jury instruction is a correct statement of the law is insufficient to preserve an objection to the trial court's refusal to give the instruction.'" Ex parte R.D.W., 773 So.2d 426, 429 n. 3 (Ala. 2000) (quoting Knight v. State, 710 So.2d 511, 513 (Ala.Crim.App. 1997)). See also Towner v. Hosea O. Weaver Sons, 614 So.2d 1020
(Ala. 1993). Therefore, the first stated ground of objection for the refusal of the trial court to give requested jury instruction no. 4 did not preserve an objection. The second ground of objection, that "those charges are applicable to the facts in this case," suffers the same lack of particularity that invalidates the first ground. See Knight, supra. The third ground of objection by Dr. Vaughan and the Group, referring only by number to 12 jury instructions refused, that the oral *Page 1178 
charge of the trial court did not adequately cover "those propositions" is "too general to give the trial court an opportunity to correct any errors that it may have made." Northeast Alabama Reg'l Med. Ctr. v.Owens, 584 So.2d 1360, 1364 (Ala. 1991). Even if Dr. Vaughan and the Group properly had interposed a legally sufficient objection to the refusal of their requested jury instruction no. 4, the trial court did not err in refusing that instruction because the oral instruction of the trial court to the jury adequately covered the requested written instruction. Baptist Mem'l Hosp. v. Bowen, 591 So.2d 74 (Ala. 1991), andOwens, supra.
 D. Cumulative Effect of Errors
Dr. Vaughan and the Group assert that "[t]he cumulative effect of the errors occurring at trial requires that a new trial be granted." Their argument is that, even if "none of the grounds discussed herein is sufficient alone to warrant a new trial, the cumulative effect of these matters dictates that a new trial be granted." Brief, p. 22. We have not found any properly preserved error.
The grant or denial of a motion for new trial is within the sound discretion of the trial court, and "this Court will not reverse a ruling in that regard unless it finds that the ruling constituted an abuse of that discretion." Colbert County-Northwest Alabama Healthcare Auth., 678 So.2d at 722. Dr. Vaughan and the Group have not established that the denial of their motion for a new trial constituted an abuse of discretion.
 III. Amending the Judgment
Dr. Vaughan and the Group argue that the trial court erred in refusing to amend the judgment to conform to § 6-5-543(b), Ala. Code 1975:
 "(b) Where the damages assessed against a defendant or defendants by the trier of fact include an award of future damages, the trial court shall comply with the following in rendering its judgment in the case:
 "(1) Judgment shall be entered against the defendants for all past damages and punitive damages assessed against the defendants by the trier of fact;
 "(2)a. If the award of future damages assessed by the trier of fact is $150,000 or less, the trial court shall enter judgment against the defendants for the amount of such future damages.
 "b. If the award of future damages assessed by the trier of fact is greater than $150,000, the trial court shall (i) enter judgment against the defendants for $150,000 of such future damages and (ii) enter judgment requiring the defendants to pay the balance of such future damages in excess of $150,000 by periodic payments over a period of years not to exceed such period of years as, according to the evidence, offered during the trial of the case, such future damages may be incurred. In entering a judgment against the defendants ordering the payment of future damages by periodic payments the trial court shall make a specific finding as to the dollar amount of periodic payments which will compensate the judgment creditor for such future damages as the same may be incurred, as determined from the evidence offered during the trial of the case. If, or to the extent that, the evidence offered at trial did not indicate the approximate time or timeframe within which the future damages would be incurred, the trial court, for the purpose of determining the amount of periodic payments and the interval between such payments, *Page 1179 
 shall conclusively presume that such damages will be incurred throughout the life expectancy of the judgment creditor on an equal monthly basis. The judgment ordering payment of future damages by periodic payments shall specify the recipient or recipients of the payments, the dollar amounts of the payments, the interval between payments, and the number of payments or the period of time over which payments shall be made. The total amount of all such periodic payments when added to the sum of $150,000 and when added to that portion of the future damages award utilized for the payment of a portion of the attorney's fees owed by the judgment creditor shall not exceed the total amount of future damages contained in the verdict."
The word "shall" in § 6-5-543(b) connotes a mandatory duty for a trial court to order the payment of future damages in excess of $150,000 in periodic payments. See Prince v. Hunter, 388 So.2d 546 (Ala. 1980). The trial court did not comply with the requirements of §6-5-543(b). Rather, the trial court entered a judgment on the jury's award of $500,000 in past damages and $2,000,000 in future damages and erroneously denied the motion of Dr. Vaughan and the Group to amend the judgment to comply with the requirements of § 6-5-543(b).
Accordingly, we affirm that portion of the judgment of the trial court entered in favor of Oliver for $500,000 in past damages and reverse that portion of the judgment entered in favor of Oliver for $2,000,000 for future damages. We remand this case for the trial court to comply with the requirements of § 6-5-543(b). Additionally, we instruct the trial court to require that Dr. Vaughan and the Group
 "[a]s a condition to authorizing periodic payments for future damages . . .[,] either post security sufficient to assure full payment of such damages, or provide evidence [that they] have insurance sufficient to pay the periodic payments as the same become due and that the insurance company which is obligated to pay the judgment holds a certificate of authority in this state, or purchase an annuity of sufficient value to pay the future damages."
§ 6-5-543(c). Further, we instruct the trial court to
 "determine what portion of the award of future damages in excess of $150,000 is owed to the attorney under contract and . . . enter judgment for the remainder of the award of future damages in excess of $150,000 as provided in subsection (c)(2)b. As to that portion of the award of future damages in excess of $150,000 which is owed to [Oliver's] attorney, that portion shall be reduced to present value by the court, utilizing the life expectancy of the judgment creditor, and judgment shall be entered against [Dr. Vaughan and the Group] for the reduced amount."
§ 6-5-543(d).
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
Moore, C.J., and Houston, Brown, Harwood, Woodall, and Stuart, JJ., concur.
See, J., concurs in the result as to Part II.A.; and concurs otherwise.
Lyons, J., concurs in the result as to Part I; and concurs otherwise.
[1] This entity is distinct from Medical Center East ("MCE").
[2] Oliver sued other defendants who are not parties to this appeal.