Defendant Buford Whitt appeals from a judgment of the Madison County Circuit Court in favor of plaintiffs Sally Jones Hulsey, Dewey Jones, Willie Hatchett, and Delaney Hatchett Spray. We affirm.
In their complaint, the plaintiffs allege that they are descendants of Benjamin Ellis, who died in 1853 and who is buried in a family cemetery in Madison County. The plaintiffs assert that the family cemetery consists of one-quarter acre that was excepted from an 1879 deed conveying a larger tract, and that this land was reserved for a family burial ground. They claim that Whitt purchased the property surrounding the cemetery in 1983, and that he has destroyed a fence surrounding the cemetery and has otherwise damaged the cemetery. The pretrial order delineated causes of action "based on trespass; desecration of a cemetery; and tort of outrageous conduct; and for injunctive relief establishing the boundaries of the cemetery and access thereto." The jury found in favor of the plaintiffs and assessed damages at $14,500. The trial court rendered judgment based on the jury verdict and made the following findings:
 "Upon consideration of the verdict of the jury, which the Court considers to be advisory as to the equitable issues of this case, the Court finds, and does hereby ADJUDGE and DECREE, that the Plaintiffs, as next of kin of Benjamin Ellis, are the owners of a one-quarter acre tract of real property situated in the Northwest Quarter of Section 9, Township 2 South, Range 1 West in Madison County, Alabama, the same being known as the Benjamin Ellis Cemetery.
 "The Court finds that the Benjamin Ellis Cemetery is surrounded by real property owned by the Defendant, Buford Whitt. The Court further finds that the Plaintiffs and other persons interested in the Benjamin Ellis Cemetery have the unlimited right and privilege of ingress and egress to and from said Cemetery over the lands of the Defendant, and a right to inter additional deceased persons in said cemetery. Upon consideration of the foregoing, the Defendant is hereby enjoined and restrained from prohibiting access to said Cemetery, and is ORDERED to permit ingress and egress to and from said Cemetery for lawful purposes, including the interment of additional deceased persons."
The trial court also directed the parties to submit surveys of the boundary of the cemetery, along with their contentions with respect to the locations of the boundary.
Following the submission of surveys and contentions of counsel for both parties, and after viewing the site of the cemetery, the trial court adopted the survey proposed by the plaintiffs as the boundary of the cemetery. In addition, the trial court made the following findings:
 "It is further ORDERED, ADJUDGED and DECREED that the Plaintiffs and all others with any interest in the Benjamin Ellis Cemetery shall have a right of ingress and egress to and from said cemetery parcel over the lands of the Defendant, and the Defendant and his successors and assigns are hereby ORDERED to allow such ingress and egress by keeping the currently existing roadway from Monroe Road to the cemetery open and unobstructed for such use, *Page 903 
provided that such ingress and egress shall be via the route passing to the North of the farming building and grain silos constructed by the Defendant adjacent to a portion of such roadway (and not via the Southern fork of such roadway running between the farm building and silos and other farm buildings).
 "It is further ORDERED, ADJUDGED and DECREED that the Plaintiffs shall, within ninety days of the date of this Judgment, construct and thereafter maintain a suitable boundary fence along the boundary of the Benjamin Ellis Cemetery as herein established; provided, however, that if this cause is appealed, then the Plaintiffs shall have ninety days from the date a final determination is entered in this cause upon appeal in order to construct said boundary fence."
Whitt's motions for judgment notwithstanding the verdict and for new trial were denied by the trial court. Whitt appeals, presenting six issues for review.
Whitt's first contention is that the trial court committed error by reading a criminal statute, Ala. Code 1975, §13A-7-23.1, in charging the jury on the claim for desecration of a tomb or gravestone. The trial judge charged the jury as follows:
 "Any person who willfully or maliciously injures, defaces, removes, or destroys any tomb, monument, gravestone or other memorial of the dead or any fence or enclosure about any tomb, monument, gravestone or memorial or who willfully and wrongfully destroys, removes, cuts, breaks, or injures any tree, shrub, plant, flower, decoration or other real or personal property within any cemetery or graveyard shall be guilty of a Class A misdemeanor. Of course, the Defendant is not charged with a criminal offense here, Ladies and Gentlemen. . . ."
Citing Lassetter v. King, 249 Ala. 422, 31 So.2d 588 (1947), Whitt contends that the trial court erroneously charged the jury by reading a criminal charge to the jury in a civil action, and that he thus is entitled to a new trial. Lassetter
involved a civil action for wrongful death caused by the negligent operation of an automobile, and a new trial was granted based upon the trial court's having charged the jury on the criminal law relating to reckless driving. The Lassetter
Court observed that the "charge restates practically in full the criminal statute regarding reckless driving, with the details of minimum and maximum punishment to be imposed, including the prohibition against further driving for at least six months." 249 Ala. at 423, 31 So.2d at 589. The Court, in denying the petition for writ of certiorari, held:
 "The Court of Appeals has concluded that, considering the entire record, this charge not only had a tendency to mislead but in fact did mislead the jury, and that the giving of such a charge justified the action of the court in granting a new trial. We are unwilling to hold that the Court of Appeals was in error in this regard."
249 Ala. at 424, 31 So.2d at 590.
The charge read to the jury in this case differs from the charge given in Lassetter, however, because it did not include the range of punishment upon conviction, as did the charge inLassetter. See McGough Bakeries Corp. v. Reynolds, 250 Ala. 592,597-98, 35 So.2d 332, 337 (1948). The charge given the jury on the desecration claim stated the elements of the action without mentioning any possible punishment. Furthermore, the trial court clearly instructed the jury that Whitt was "not charged with a criminal offense." We find no error in this instance by the trial court in its instruction to the jury on the desecration claim.
The second argument advanced by Whitt is that the evidence presented at trial did not warrant submission of a cause of action for outrageous conduct to the jury. The tort of outrage was recognized in Alabama in American Road Service Co.v. Inmon, 394 So.2d 361 (Ala. 1980), and was defined by theInmon Court as follows:
 "[O]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress and for bodily harm resulting from *Page 904 
the distress. The emotional distress thereunder must be so severe that no reasonable person could be expected to endure it. Any recovery must be reasonable and justified under the circumstances, liability ensuing only when the conduct is extreme. . . . By extreme we refer to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society. . . ."
394 So.2d at 365. For an outrageous conduct count to be properly submitted to a jury, there must be "sufficient evidence from which permissible inferences could be drawn to support a finding of the extreme conduct necessary to constitute outrageous conduct." Empiregas, Inc. v. Geary,431 So.2d 1258, 1261 (Ala. 1983).
Whitt contends that his conduct in reclaiming the land and his subsequent encroachment onto a portion of the quarter acre designated as a cemetery was accidental, and was by no means intentional. Neither the deed to the property purchased by Whitt nor the title examination with regard to that property revealed the existence of a cemetery on the 605-acre tract. However, evidence was presented to indicate that Whitt was aware that there was a cemetery on the property. Billy League, who had a lease on the property at the time Whitt bought it, testified that in the summer of 1983 he pointed out the general location of the cemetery to Whitt as they rode over the property in a truck. Sam Watson, who worked for Billy League on the farm, testified that before Whitt bought the property the cemetery was grown up "a little bit around the edges . . . but inside the fence the cemetery was clean." Watson estimated the size of the cemetery to be "a quarter of an acre," and he stated that an old fence surrounded the whole cemetery with a newer fence inside it. Watson also testified as follows:
"Q. Did you ever at any time have an occasion to see Dr. Whitt doing any heavy equipment work near that cemetery?
"A. Yeah, I seen him down there around it pushing off around the edge of it.
"Q. Do you remember about when this was?
"A. It was '83, I guess, something like that.
"Q. Sometime a couple of months after he bought the place?
"A. Yeah.
"Q. Did you witness anybody else doing any heavy equipment work around that cemetery about that time?
"A. No sir, weren't nobody else down there.
"Q. Or any other time?
"A. Not around the cemetery.
"Q. Did you ever have a discussion with Dr. Whitt about that cemetery?
"A. Yes, sir, I did.
"Q. Tell the jury what happened. Why did you have this discussion with Dr. Whitt?
"A. Like I said, he was down there right at the edge of the cemetery pushing off and I thought I would go down there and let him know where the cemetery was. I didn't know he knew where the cemetery was at that time. I went down there and showed him the cemetery. He said he knowed the cemetery was there. He said Billy League had done told him the cemetery was there.
"Q. Then what did you do after you told him that?
"A. Well, I told him, I said, there is a fence around it, and he stood there and talked to me for a few minutes and I got in the truck and drove off.
"Q. Where was he when you first went up to him?
"A. He was on the bulldozer when I drove up. I drove the truck down there.
"Q. Did he get off of the bulldozer?
"A. He got off of the dozer and talked to me.
"Q. Did you and he then begin to have a conversation?
"A. Yes. *Page 905 
"Q. From where you and he were talking, could you see the barbed-wire fence or the old fence around the cemetery?
"A. No, sir, I don't guess you could see the old fence there.
"Q. Could you see the new fence?
"A. You could see the new fence good where we were standing.
"Q. Did you point the fence out?
"A. Yes.
"Q. After you had this conversation with Dr. Whitt, where did you go?
"A. I went back out to my mother's. She lived right there on the place, too.
"Q. She lived about 150 yards away from the cemetery?
"A. Maybe 200 yards.
"Q. Had the cemetery changed any the next time you saw it?
"A. Yes, sir. I went down there, I guess, within an hour after the cemetery had been cleaned off. I went back down there.
"Q. How was it different when you went back down there about an hour later?
"A. It looked like to me a whole lot of it had been pushed off, the tombstones and stuff like that.
"Q. Did you see any periwinkle or cemetery plant down there before?
"A. Yes, sir, there was some ivy-like stuff down there.
"Q. Had it been pushed off?
"A. Yes, sir.
"Q. In your judgment how many of the tombstones had been pushed off?
"A. I wouldn't know that. I know there was a lot of them on the north side below where the tombstones were at that were gone.
"Q. Would you have a judgment on how many there was?
"A. I would say five or six anyway; something like that. I know there was that many there. I would say there was that many there anyway.
"Q. Was the fence still standing?
"A. No, sir."
Dorothy Johnson, a local genealogist, testified that she visited the Benjamin Ellis cemetery in January 1983 for the purpose of copying the inscriptions on the tombstones. Johnson described the area around the cemetery as a "jungle" with a thick undergrowth. She stated that she was surprised when she came upon the cemetery because "there was a clearing between the jungle and the cemetery itself." Johnson related that a "wire farm fence" surrounded a portion of the graves, with an entrance afforded by a wrought iron gate. She testified that outside the fence on the north side of the enclosed portion of the cemetery the ground was covered with Vinca minor, a traditional ground cover in old family cemeteries, and she observed there "the small tombstone of a Garner baby" and some "cemetery sinks." Johnson testified as follows regarding the changes she observed when she visited the cemetery in October 1983:
 "[T]he portion outside of the fence was completely gone. It was obliterated. The grave stones, the sinks, the Vinca minor, the trees [were] gone. Nothing there but plowed ground. The fence was gone. . . . [T]he tombstone of Emma Ellis, which was in the third row, stood all by itself, was gone. It had been broken off and the base — you could see the base of it still protruding up through the ground, but the top part of that stone was gone, just gone. The tombstone of little Hulda had a large chunk broken out of it."
Whitt testified that he first saw the cemetery while working to clear the land on the south side of the cemetery, at which time he "stopped and got off and looked to see if there were any physical structures there that point out . . . the boundaries of the cemetery." Whitt recounted that he searched for physical structures to ascertain the boundaries of the cemetery, which he determined to be 36 feet by 36 feet. Whitt then proceeded to operate the bulldozer "all of the way around the area that I ascertain[ed] to be the cemetery." Whitt denied that he damaged or destroyed any of the tombstones, the fence and gate, or *Page 906 
the Vinca minor inside the area that he considered to comprise the cemetery.
We are persuaded that sufficient evidence was presented to support the submission of the outrageous conduct count to the jury. The evidence at the very least supports an inference that Whitt acted recklessly in clearing the land around the cemetery where relatives of the plaintiffs were buried. We realize that there may be differences of opinion regarding the dividing line between merely offensive conduct and conduct that is atrocious and intolerable in a civilized society. Growth Properties I v. Cannon, 282 Ark. 472,669 S.W.2d 447 (1984). Great respect is afforded the resting place of the dead. See Kerlin v. Ramage, 200 Ala. 428, 76 So. 360
(1917); and Bessemer Land Improvement Co. v. Jenkins,111 Ala. 135, 18 So. 565 (1895). This sentiment is repeated inHolder v. Elmwood Corp., 231 Ala. 411, 413, 165 So. 235, 237
(1936): "Our decisions lay much stress upon the sacredness of the resting ground of the dead . . ., and the exclusive right of interment and possession being shown, guard the spot against unlawful invasion and give a right of action for any illegal interference. . . ." Under the particular facts of this case, and in view of the deep human feelings involved, we find the evidence sufficient to support the claim of outrageous conduct, where the alleged act was the desecration and destruction of a portion of a family burial ground.
Whitt's third contention is that the trial court improperly allowed the jury to award punitive damages. Whitt claims that there is no evidence to support an award of punitive damages, citing Gulf Atlantic Life Ins. Co. v. Barnes, 405 So.2d 916
(Ala. 1981), for the proposition that punitive damages may be awarded only where there has been a showing of malice, willfulness, or wanton and reckless disregard for the rights of others. The record, however, contains evidence from which the jury could determine that punitive damages are proper. InRushing v. Hooper-McDonald, Inc., 293 Ala. 56, 61,300 So.2d 94, 98 (1974), the Court stated:
 "A jury is warranted in awarding punitive damages in the case of trespass if the trespass is attended by rudeness, wantonness, recklessness or an insulting manner or is accompanied by circumstances of fraud and malice, oppression, aggravation, or gross negligence."
The intent of the defendant was a question for the jury,Smith Gaston Funeral Directors, Inc. v. Dean, 262 Ala. 600,80 So.2d 227 (1955), and we find no basis to disturb the finding of the jury with regard to the award of punitive damages.
The next argument advanced by Whitt is that the plaintiffs failed to prove any actual damages, and thus that they should be limited to a recovery of nominal damages only. Although the only testimony concerning the value of the land before and after the acts complained of was inconclusive, there was testimony regarding the cost to replace the wire fence surrounding the cemetery that was alleged to have been removed by Whitt. To recover punitive damages, a plaintiff must show at least nominal damages. Gulf Atlantic Life Ins. Co.v. Barnes, 405 So.2d 916 (Ala. 1981); Rushing v.Hooper-McDonald, Inc., 293 Ala. 56, 300 So.2d 94 (1974). The evidence in this case supports the jury's determination of nominal damages.
Whitt's fifth argument is that the trial court's determination of the cemetery boundary is manifestly unjust and erroneous. Whitt's major objection to the boundary as determined by the trial court is that a corner of the boundary juts into and interferes with the use of a delivery road surrounding a substantial farming and silo complex built by Whitt. The trial court received proposed surveys of the cemetery boundaries from the plaintiffs and from Whitt, along with their respective contentions as to the location of the boundaries. After viewing the cemetery site and examining the boundaries as proposed by the surveys, the trial court objected to Whitt's survey because it "came within inches of the foot of several graves and was designed so that none of the uses made of the property by the Defendant in proximity to the cemetery would be affected." Whitt *Page 907 
submitted a second proposed survey, which the trial court found "suffers only slightly less from the defects proposed in the Defendant's original proposal." In adopting the survey submitted by the plaintiffs as indicating the boundary of the cemetery, the trial court stated:
 "The survey proposed by the Plaintiffs has as its center point the center of the Benjamin Ellis grave. The angles of the boundary lines have been positioned so as to minimize conflict with structures built by the Defendant, while enclosing the area of the gravesites and respecting the sanctity thereof."
The trial court's determination of the cemetery boundary was based upon ore tenus evidence and upon the trial court's view of the site. Under our ore tenus standard of review, the findings of the trial court, when supported by evidence, are presumed to be correct and will not be disturbed on appeal unless the findings are plainly and palpably erroneous and manifestly unjust. Collins v. Windsor, 505 So.2d 1205 (Ala. 1987). The presumption of correctness is strengthened where the trial court makes a personal inspection of the property before making its findings of fact. Smith v. Smith, 482 So.2d 1172
(Ala. 1985); Darby v. Robbins, 409 So.2d 722 (Ala. 1981). Based upon the evidence presented to the trial court, we cannot say that its findings are erroneous or manifestly unjust.
The final argument presented by Whitt is that the trial court lacked jurisdiction to grant a right of ingress to and egress from the cemetery over the land belonging to Whitt to the plaintiffs and to all others with any interest in the cemetery. Whitt also contends that the owners of the cemetery should be required to pay for the use of the road over his property. On redirect examination, Whitt's attorney asked Whitt the following question: "Will you be willing to abide by whatever this court says the boundaries are for that graveyard and let these folks come and go as they please?" Whitt responded: "That is right, yes, sir." Because the issue of the right-of-way over Whitt's land to provide access to the cemetery was not raised in the trial court, we cannot consider that issue on appeal. City of Rainbow City v. Ramsey,417 So.2d 172 (Ala. 1982); Hutchins v. Shepard, 370 So.2d 275
(Ala. 1979).
The judgment of the trial court is affirmed.
AFFIRMED.
TORBERT, C.J., and JONES, SHORES, ADAMS and STEAGALL, JJ., concur.