This is a negligence/wantonness case. The defendants George H. Lanier Memorial Hospital, Jason Ivey, and Shannon Chambers Brooks a/k/a Shannon Strength appeal from a judgment entered on a jury verdict in favor of the plaintiffs, Steven Andrews and Cynthia Shealey. We reverse and remand. *Page 804 
 I. Facts and Procedural History
On the morning of December 21, 1996, Cynthia Shealey took her 11-year-old son, Steven Shealey, to the emergency room at George H. Lanier Memorial Hospital. The child was suffering from a severe asthma attack; he died at the hospital. Shortly after his death, Jeani West, a nurse at the hospital, asked Shealey if she would be willing for her son to be an organ donor. Shealey replied by saying that it did not matter. Jason Ivey, another nurse who was just coming on duty, witnessed this conversation.
Based on Shealey's response, West, who was about to end her shift, began looking for an organ-donor form for Shealey to sign. She did not locate the form before Shealey left the emergency-room area; consequently, West did not obtain Shealey's signature on the consent form. Eventually, a consent form was located. West and Ivey signed the form. They both recognized, however, that their signatures were insufficient to authorize any organ donation. Nevertheless, based on the belief that Shealey had consented to donate her son's organs, Ivey began the process of contacting the appropriate agencies.
Upon speaking with a representative of the Alabama Organ Center, Ivey learned that the child did not qualify for organ donation; Ivey was advised to contact the Alabama Eye Bank. Another nurse, Shannon Strength, telephoned the Montgomery office of the Alabama Eye Bank. She left a message asking that a representative contact the hospital. Shortly thereafter, Paul Cau, an employee of the Alabama Eye Bank, telephoned the hospital and spoke with Ivey. Ivey advised Cau that the hospital had a possible cornea donor, that the potential donor was a child, and that the nurses were in the process of obtaining, by telephone, the consent of the child's mother. Cau asked several questions about the child's medical history and the cause of death. Cau also questioned Ivey about the hospital's consent form. Upon speaking with Ivey, Cau determined that the hospital did not have one of Alabama Eye Bank's updated consent forms. Because the updated consent form featured several health-related questions to be answered by the consent-giver, Cau faxed a copy to Ivey for him to use. Shealey had left the hospital by the time Ivey received the faxed consent form, so Ivey and Strength needed to obtain her consent by telephone.
Ivey located the telephone number of Shealey's neighbor, from the information contained in the child's chart. When Shealey came to the telephone, Ivey identified himself and asked her each of the questions included on the updated consent form. Ivey then told Shealey that he needed her to say the words "I give permission for organ donation for Steven Shealey." After Shealey repeated those words, Strength picked up an adjacent telephone, identified herself, and asked Shealey to repeat that she had given consent for the corneal donation, and Shealey did so. Strength was standing next to Ivey throughout Ivey's telephone conversation with Shealey, and she never heard Ivey tell Shealey that the child's father, Steven Andrews, had refused to consent to the donation. Immediately after speaking with Shealey, Ivey completed the updated consent form, and both he and Strength signed it.
Contrary to Ivey's testimony, Shealey testified at trial that she left the hospital and went to Andrews's home at approximately 8:00 a.m. After speaking with Andrews, she said, she returned to her home. At approximately 9:00 a.m., Andrews went to the hospital, where Ivey approached him with the updated consent form and requested Andrews's signature. Andrews testified that he told Ivey he would not *Page 805 
sign the form because his religion does not support organ donation. Shealey stated that she did not receive the telephone call from Ivey until mid-morning. During the conversation, Shealey said, she answered Ivey's questions and then Ivey asked her if she could get the father to change his mind about organ donation. Shealey said she responded by saying that she could not. Shealey also testified that when Ivey asked her again to consent to the corneal donation, she stated that "it doesn't matter."
When Cau arrived at the hospital, Ivey presented him with the child's medical chart and the consent form, which had been filled out and signed by Ivey and Strength. Because the consent form had been filled out by the nurses, rather than by Shealey, Cau wrote "obtained telephone consent" at the top of the form and printed Shealey's name on the signature line at the bottom of the form. Cau took the consent form and copied the child's entire hospital record to take with him.
After Cau had left the hospital, Ivey realized that they did not have a copy of the completed consent form for the hospital's records. Using a photocopy of a blank consent form, Ivey and Strength completed the form, signed their names at the bottom, and placed it in the child's medical file. Both the original and the reproduced consent forms were admitted at trial. They are identical in all respects, except for the handwritten notes of Cau indicting that Ivey and Strength had "obtained telephone consent" for the donation.
Shealey and Andrews learned later that afternoon that their son's corneas had been "harvested." They learned this when Andrews contacted the hospital to determine when their son's body would be released.
Shealey and Andrews sued the hospital, Ivey, Strength, and Alabama Eye Bank, on May 22, 1997. The complaint alleged that neither parent had consented to the corneal donation, and it asserted claims based on the tort of outrage, negligence per se, and negligence or wantonness. Shealey and Andrews later added a claim alleging conversion of the child's corneas and claims alleging fraud and conspiracy. The trial court entered a summary judgment in favor of Alabama Eye Bank in December 1998.[1]
The case proceeded to trial in the Chambers Circuit Court.
At the conclusion of the trial, the court charged the jury only on the claims alleging negligence and wantonness. The charge also included a variation of § 13A-11-13, Ala. Code 1975, which makes it a class A misdemeanor to abuse a corpse. The trial court told the jury:
 "A person has a duty to exercise reasonable care so as to treat a human corpse in a way that does not outrage ordinary family sensibilities. Except as otherwise authorized by law, the law requires that a person shall not knowingly treat a human corpse in a way that would outrage ordinary family sensibilities."
The hospital, Ivey, and Strength objected to this charge, on the ground that it erroneously combined the concept of procuring consent to harvest organs for an unreimbursed purpose, with the problems dealt with by criminal statutes regarding desecration of a grave, mutilation of a dead body, or removal of a dead body from a grave.
After deliberating, the jury returned a verdict in favor of Shealey and Andrews. It awarded the custodial parent, Shealey, $85,000 and awarded Andrews $15,000. The hospital, Ivey, and Strength timely *Page 806 
filed post-judgment motions, which the trial court denied.
 II. Analysis
The hospital, Ivey, and Strength argue that the trial court erred by instructing the jury on a duty based on criminal law in a case involving claims of negligence and wantonness.
Under Alabama law, "`[a] party is entitled to proper jury instructions regarding the issues presented, and an incorrect or misleading charge may be the basis for the granting of a new trial.'" King v. W.A. Brown Sons, Inc., 585 So.2d 10, 12 (Ala. 1991) (citation omitted). When an objection to a jury charge has been properly preserved for review on appeal, as this one was, we "`look to the entirety of the [jury] charge to see if there was reversible error,'" and reversal is warranted only if the error is prejudicial. King, 585 So.2d at 12.
As noted above, in its charge, the trial court stated:
 "A person has a duty to exercise reasonable care so as to treat a human corpse in a way that does not outrage ordinary family sensibilities. Except as otherwise authorized by law, the law requires that a person shall not knowingly treat a human corpse in a way that would outrage ordinary family sensibilities."
The trial court's instruction originates from § 13A-11-13, Ala. Code 1975, which provides that the abuse of a corpse is a class A misdemeanor. Section 13A-11-13 was intended as a consolidation of former Alabama criminal statutes regarding removal of a dead body from a grave, purchase of dead bodies, violation of a grave with intent to steal, mutilation of a dead body, and desecration of a grave. The hospital, Ivey, and Strength argue that this instruction to the jury prejudicially aligned procuring consent to harvest organs for an unreimbursed purpose with these crimes.
A trial court charging a jury in a civil case does not commit reversible error simply by giving the jury a charge based on a criminal statute. Whitt v. Hulsey, 519 So.2d 901, 903 (Ala. 1987). Where the charge given states the elements of the action, without mentioning possible punishment, and clearly instructs the jury that the defendant is not charged with any crime, no reversible error is committed. See Whitt, 519 So.2d at 903 (construing Lassetter v. King, 249 Ala. 422, 31 So.2d 588
(1947)). The trial court worded its statement based on the criminal statute in such a way as to exclude any mention of a crime, abuse of a corpse, or punishment. However, the instructions based on the criminal statute were not relevant to this case. The statement did not contain the elements of the action that was before the jury; rather, it introduced extraneous elements and an extraneous duty that was not at issue. Based on the facts alleged, the hospital, Ivey, and Strength would have had a duty to comply with the provisions of the Alabama Uniform Anatomical Gift Act ("the Gift Act"), § 22-19-41 et seq., Ala. Code 1975, and the Lifesaving Organ Procurement Act ("the Procurement Act"), § 22-19-140
et seq., Ala. Code 1975.[2] Shealey and Andrews did not allege that the hospital, Ivey, Strength, or Alabama Eye Bank had abused their son's corpse in any way. The trial court entered *Page 807 
a summary judgment for the defendants as to the outrage claim, and Andrews and Shealey voluntarily dismissed their conversion claim. The fact that some might view the charge as increasing, rather than diminishing, the plaintiffs' burden of proof is of no moment. The defendants were entitled to instructions that were germane to the legal theories for which there was substantial evidence. Therefore, the trial court's charge was prejudicial and constituted reversible error.
REVERSED AND REMANDED.
Houston, See, Lyons, Harwood, Woodall, and Stuart, JJ., concur.
Moore, C.J., and Johnstone, J., dissent.
[1] Andrews and Shealey appealed from that summary judgment, which we affirmed in Andrews v. Alabama Eye Bank, 727 So.2d 62 (Ala. 1999).
[2] "The [Gift Act] outlines the means of effecting an anatomical gift, the persons who may make such a gift, and the circumstances under which the gift must be deemed invalid." Andrews v. Alabama Eye Bank,727 So.2d 62, 64 (Ala. 1999). The Procurement Act was enacted 17 years after the Gift Act, and it adds the requirement that hospital administrators request permission to obtain the organs of a decedent's body as an anatomical gift. § 22-19-140 et seq., Ala. Code 1975.