901 So.2d 714 (2004)
GEORGE H. LANIER MEMORIAL HOSPITAL and Jason Ivey
v.
Steven ANDREWS and Cynthia Shealey.
1021885.
Supreme Court of Alabama.
November 19, 2004.
*717 Robert C. (Mike) Brock and Ben C. Wilson of Rushton, Stakely, Johnston & Garrett, P.A., Montgomery; and Claud E. (Skip) McCoy of Johnson, Caldwell & McCoy, Lanett, for appellants.
James V. Green, Jr., and Jill T. Karle, Alabaster; and S. Sanford Holliday, Roanoke, for appellees.
HARWOOD, Justice.
George H. Lanier Memorial Hospital ("the hospital") and Jason Ivey, R.N., appeal from the denial of a renewed motion for a judgment as a matter of law and the denial of their motion for remittitur or, alternatively, for a new trial. A jury found the hospital and Ivey liable for the negligent or wanton removal of the corneas of a deceased minor and awarded $200,000 in compensatory damages. We affirm.
On December 21, 1996, Cynthia Shealey brought her 12-year-old son Steven Shealey to the hospital's emergency room; Steven was suffering from a severe asthma attack. At approximately 6:28 a.m. that morning,[1] Steven died as the result of cardiac arrest secondary to the asthma attack.
After Cynthia was notified of Steven's death, nurse Jeani West requested that Cynthia sign various forms; among those forms was a form necessary to release Steven's body to a funeral home, which Cynthia signed at 7:20 a.m. West also asked whether Cynthia would like to donate any of Steven's organs. Ivey, a nurse who had come on duty around 6:45 a.m., was standing nearby and overheard the conversation between West and Cynthia. He testified that Cynthia expressed to West a willingness to donate Steven's organs. Another nurse, Shannon Strength, also saw West and Cynthia talking, but did not hear their discussion. Cynthia testified that when West asked her about organ donation, she simply stated that it "really didn't matter."
West began searching for an organ-donation consent form, and because she could not immediately find the form, she led Cynthia to a nearby room, known as the "quiet room," where Cynthia waited for West to return. After approximately 20 minutes, Cynthia left the quiet room, informed West that she was leaving the hospital, and departed. Shortly thereafter, West's shift ended. At this time, Ivey took over as the charge nurse.
Unaware that Cynthia had left the hospital, Ivey took an organ-donation consent form to the quiet room for Cynthia's signature. Discovering that Cynthia had left the hospital, Ivey proceeded on the assumption that Cynthia desired to donate Steven's organs, although Ivey did not regard *718 Cynthia's earlier statements as unequivocally manifesting consent.
Ivey telephoned the Alabama Organ Center, representing that Steven was "a potential donor." The Alabama Organ Center notified Ivey that Steven did not qualify for organ donation and suggested that Ivey telephone the Alabama Eye Bank ("the Eye Bank").
Ivey directed Strength to telephone the Eye Bank, which she did. Strength left a message with the Eye Bank's answering service. Shortly thereafter, at approximately 9:00 a.m., Paul Cau, an employee of the Eye Bank, telephoned the hospital and spoke with Ivey. Ivey informed Cau that the hospital had "a possible [cornea] donor" and that he was in the process of obtaining telephone consent for the organ donation. After some discussion, the two determined that the consent form the hospital had on file for the Eye Bank was outdated. Cau faxed an updated form to the hospital, directed to Ivey's attention.
While these events were occurring at the hospital, Cynthia drove to the home of Steven's father, Steven Andrews, to inform him of their son's death.[2] She arrived at Andrews's house around 8:00 a.m. She informed Andrews of Steven's death, and some 30 minutes later, when he prepared to go to the hospital, she left for her house. Cynthia arrived at her house, which was approximately a 15-minute drive from Andrews's house, at roughly 9:00 a.m. Andrews, meanwhile, left for the hospital, where he arrived around 9:00 a.m.
At the hospital, between 9:00 a.m. and 9:20 a.m., Ivey received the faxed copy of the updated consent form from Cau at the Eye Bank. Ivey located Strength and brought her to the nurse's station to secure telephonic consent from Cynthia. Ivey dialed the number given by Cynthia, which was actually the telephone number of Cynthia's neighbor in her apartment complex. The neighbor answered the telephone and summoned Cynthia to the telephone.
When Cynthia was on the line, Ivey began to talk to her about organ donation. He asked her the questions on the Eye Bank consent form; Cynthia answered each question, and Ivey noted her response. At this point, Strength joined the conversation on another telephone so that Cynthia, Ivey, and Strength were simultaneously on the same line. Ivey then told Cynthia that if she desired to donate Steven's organs, she needed to state the words, "I give permission for Steven Shealey to be an organ donor."
According to both Ivey and Strength, Cynthia repeated that statement or a statement of substantially similar import, thereby consenting to donate Steven's organs. Further, both Ivey and Strength testified that no mention of Andrews was made during that telephone conversation, either by them or by Cynthia. Rather, they each testified, Andrews arrived after Cynthia had consented to donation. Ivey testified that he personally informed Andrews of Cynthia's consent and requested Andrews's signature on the consent form so that the hospital would have in-person consent. Ivey further testified that Andrews immediately handed back the consent form and told Ivey, "I don't want to deal with this right now."
Cynthia and Andrews's account of events is very different. Andrews testified that when Ivey asked him for his consent, he immediately handed the consent form back and responded simply, "No." Cynthia *719 testified that she received the telephone call from the hospital after Andrews had been approached for consent. She said that when she talked with Ivey, she answered Ivey's preliminary questions, but that when he asked for her consent, her response was that "it still really didn't matter." Additionally, Cynthia testified that Ivey sought her help in changing Andrews's mind about consenting to the donation of Steven's corneas. According to Cynthia, her response to Ivey was that if Andrews had said no to organ donation, her answer was also no.
Around 9:20 that morning, Cau at the Eye Bank telephoned the hospital. He spoke with Ivey, who informed him that Cynthia had given her telephonic consent to the donation of Steven's corneas. Around 9:30 a.m., Cau left the Eye Bank in Montgomery and traveled to the hospital. He arrived around 11:00 a.m., and at approximately 11:45 a.m., he removed Steven's corneas.
Cynthia and Andrews filed this action in the Chambers Circuit Court against the hospital, Ivey, and Strength, alleging several different theories of tort liability. The first time the case was tried, the jury awarded Cynthia and Andrews damages. This Court reversed the judgment and remanded the cause for a new trial based on the determination that the trial court's instruction to the jury, taken from a criminal statute concerning the treatment of corpses, was prejudicial to the defendants. George H. Lanier Mem'l Hosp. v. Andrews, 809 So.2d 802 (Ala.2001).
On remand, Cynthia and Andrews relied only on the count alleging negligence/wantonness. At the close of all evidence at the second trial, the hospital, Ivey, and Strength moved for judgment as a matter of law ("JML"), which motion the trial court denied. The court then instructed the jury; among the instructions given was a statement that the law allowed only four methods by which consent to donate organs could be effectuated.
The jury rendered a verdict in favor of Strength but finding the hospital and Ivey (hereinafter "the defendants") liable and awarding Cynthia and Andrews $100,000 each. The defendants renewed their motion for a JML, and, alternatively, filed a motion for a remittitur or for a new trial. The trial court allowed those motions to be denied by operation of law pursuant to Rule 59.1, Ala. R. Civ. P. The hospital and Ivey appeal.

Standard of Review
"`When reviewing a ruling on a motion for a JML, this Court uses the same standard the trial court used initially in granting or denying the motion. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala. 1997). Regarding questions of fact, the ultimate issue is whether the nonmovant has presented sufficient evidence to allow the case or issue to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). In an action filed after June 11, 1987, the nonmovant must present substantial evidence to withstand a JML. See § 12-21-12, Ala.Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Id. If the question is one of law, this Court *720 indulges no presumption of correctness as to the trial court's ruling. Ricwil, Inc. v. S.L. Pappas & Co., 599 So.2d 1126 (Ala.1992).'
"Ex parte Alfa Mut. Fire Ins. Co., 742 So.2d 1237, 1240 (Ala.1999)."
Alabama Dep't of Transp. v. Land Energy, Ltd., 886 So.2d 787, 791-92 (Ala.2004).
In reviewing jury instructions, we must keep in mind that
"`"[a] party is entitled to proper jury instructions regarding the issues presented, and an incorrect or misleading charge may be the basis for the granting of a new trial."' King v. W.A. Brown & Sons, Inc., 585 So.2d 10, 12 (Ala.1991) (citation omitted). When an objection to a jury charge has been properly preserved for review on appeal, as this one was, we `"look to the entirety of the [jury] charge to see if there was reversible error,"' and reversal is warranted only if the error is prejudicial. King, 585 So.2d at 12."
Andrews, 809 So.2d at 806.

I. Applicable Law
The defendants' first argument on appeal is that they were entitled to judgment as a matter of law because, they say, Cynthia and Andrews failed to present substantial evidence indicating that either the hospital or Ivey had breached any applicable duty of care. Specifically, the defendants argue that the Alabama Medical Liability Act, Ala.Code 1975, §§ 6-5-480 to -488, as supplemented by Ala.Code 1975, §§ 6-5-540 to -552 ("the AMLA"), governs their conduct and imposes the applicable standard of care. They further argue that Cynthia and Andrews have failed to present any evidence whatsoever indicating that the defendants violated this standard of care. Cynthia and Andrews counter that the AMLA does not apply because neither of them was in a patient-provider relationship with the hospital or Ivey.
The AMLA governs medical-malpractice actions in Alabama. Mock v. Allen, 783 So.2d 828, 832 (Ala.2000). Its purpose is, among other things, to impose a duty upon health-care providers "to exercise such reasonable care, diligence and skill" as other health-care providers in the same general line of practice. Ala.Code 1975, § 6-5-484; see also § 6-5-548(a). The AMLA applies "[i]n any action for injury or damages or wrongful death, whether in contract or in tort, against a health care provider for breach of the standard of care." Ala.Code 1975, § 6-5-548(a). The AMLA includes within the definition of a health-care provider "[a] ... hospital[] or other health care provider as [that term is] defined in Section 6-5-481." Ala.Code 1975, § 6-5-542. Section 6-5-481, in turn, includes within the definition of "other health care provider" a "person employed by ... hospitals who [is] directly involved in the delivery of health care services."
Application of the AMLA, however, is limited to fewer situations than those broad definitions may suggest. First, Ala. Code 1975, § 6-5-484(a), requires physicians, surgeons, and dentists to exercise a duty of care "to the patient," and requires a hospital to exercise its duty of care in "rendering services to a patient." Additionally, this Court has narrowly interpreted certain aspects of the AMLA. We have held that the AMLA does not apply to all injuries caused by health-care providers, but only to "medical injuries." Taylor v. Smith, 892 So.2d 887, 893 (Ala.2004). In addition, we have interpreted § 6-5-484(a) to limit a health-care provider's duty. In Thomasson v. Diethelm, 457 So.2d 397 (Ala.1984), Thomasson, a respiratory therapist, treated a patient, unaware that the patient suffered from hepatitis. As a result of her exposure to the patient, Thomasson *721 contracted hepatitis. She brought an action under the AMLA against the patient's doctors, alleging that they had a duty to warn her that the patient had hepatitis. We examined § 6-5-484(a) and concluded that the statute intended to impose liability only in a doctor-patient and/or hospital-patient relationship. Consequently, we held that the AMLA did not apply to Thomasson's action against the doctors because she was not a patient. Thomasson, 457 So.2d at 399.
In 1987, the Legislature supplemented the original Alabama Medical Liability Act with the Alabama Medical Liability Act of 1987, Ala.Code 1975, §§ 6-5-540 to -552. The AMLA as supplemented effected major changes to the original act, such as raising the burden of proof from a scintilla to substantial evidence, Ala.Code 1975, § 6-5-548(a); explicitly defining the applicable standard of care to be provided by health-care providers, Ala.Code 1975, § 6-5-542(2); and limiting testimony defining the applicable standard of care to that offered by "similarly situated" health-care providers, Ala.Code 1975, § 6-5-548(e). However, the statute that actually imposes the duty of care remains Ala.Code 1975, § 6-5-484. Breaux v. Thurston, 888 So.2d 1208, 1213 (Ala.2003); Wells v. Storey, 792 So.2d 1034, 1037 (Ala.1999).
Consequently, the standard of care in the AMLA continues to dictate that a health-care provider must offer reasonable care, skill, and diligence "to a patient." In this case, it is plain that the complained-of actions were not performed in the course of providing health-care services to a patient. Furthermore, common sense dictates that a health-care provider cannot inflict a "medical injury" upon a person who is already deceased. For these reasons, we hold that the AMLA does not apply to a health-care provider's actions in dealing with a deceased person, even when the deceased was a patient up until his death.
Because the AMLA does not apply to the defendants' conduct in their contacts with Cynthia and with Andrews, the trial court did not err in denying the defendants' renewed motion for a JML on this ground.

II. Defendants' Duty
The defendants have additionally argued that they were entitled to a JML because they acted in good faith under the Lifesaving Organ Procurement Act, Ala.Code 1975, §§ 22-19-140 to -144 ("the LOPA"), in arranging for the procurement of Steven's corneas. Cynthia and Andrews argue, however, that because they expressly withheld consent to the donation of Steven's corneas, it was not possible for the defendants to have acted in good faith.
In 1986, the Legislature enacted the LOPA. There is no dispute that a cornea, being tissue, is included within the definition of an organ in the LOPA. Ala.Code 1975, § 22-19-141(1). Section 22-19-142(a) provides, in pertinent part:
"When death occurs in a hospital to a patient who has not made an anatomical gift to take effect upon death, the hospital administrator, or designated representative, shall request [either parent]..., in the absence of actual notice of contrary indication by the decedent ..., to consent to the gift of organs of the decedent's body as an anatomical gift."
(Emphasis added.)
Subsections (c) and (d) of § 22-19-142 provide exceptions to the requirement that such a request be made. Although inapplicable here, these subsections relieve a hospital administrator or designated representative from the duty to request donation of an organ, either because no organ would be suitable for donation or because of other factors that lead the attending *722 physician to conclude that no request for donation should be made.
Section 22-19-143 provides:
"A person who acts in good faith in accord with the terms of this article or with the anatomical gift laws of this state, or another state, or a foreign country shall not be liable for damages in any civil action...."
This Court has defined "good faith" as an "`honest belief, the absence of malice and the absence of design to defraud or to seek an unconscionable advantage.'" Andrews v. Alabama Eye Bank, 727 So.2d 62, 65 (Ala.1999)(quoting Nicoletta v. Rochester Eye & Human Parts Bank, Inc., 136 Misc.2d 1065, 519 N.Y.S.2d 928 (Sup.Ct. 1987)). Presumably, the good-faith exception absolves hospital administrators or other designated representatives from liability for failing to request donation when they believe that one of the exceptions enumerated in § 22-19-142(c) or (d) applies.
Ivey argues that § 22-19-143 offers him good-faith immunity because, he says, he acted on an honest belief that Cynthia had consented to donating Steven's corneas. We agree that Ivey complied with the LOPA, regardless of the good-faith-immunity provision. However, we reach that conclusion because we take a narrow view of the requirements of the LOPA. It is clear from looking to the statute in search of its plain meaning that the LOPA imposes only one duty upon a hospital administrator or its designated representative: the duty of inquiry. The LOPA imposes no duty upon the inquirer or the institution to actually follow through and implement the instructions of the parties from whom consent is requested. "It is true that looking at a statute we might sometimes think that the ramifications of the words are inefficient or unusual. However, it is our job to say what the law is, not to say what it should be." DeKalb County LP Gas Co. v. Suburban Gas, Inc., 729 So.2d 270, 276 (Ala.1998). Consequently, once Ivey requested consent from Cynthia, he had technically fulfilled the mandate of the LOPA.
This determination, however, does not end the inquiry. Ivey's complete fulfillment of the discrete duty imposed by the LOPA does not necessarily mean that he fulfilled all applicable duties of care. Under our standard of review of a ruling on a motion for a JML, we are compelled to view the facts in the light most favorable to Cynthia and Andrews, as the nonmovants, and to draw from those facts every reasonable inference. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). Although the time frame of the events here is compatible with the testimony of both parties, so that either party's story is independently plausible, we must view the facts in a light most favorable to the nonmovants. We thus must conclude that the following events occurred in the following order. Andrews arrived at the hospital before the nurses telephoned Cynthia seeking her consent. When Ivey asked Andrews for consent to donate, Andrews told Ivey, "No." After this encounter, Ivey and Strength telephoned Cynthia, who in response to their question as to whether she would consent to donate Steven's organs initially said that it did not matter, but who, when pressed for a more definite answer, replied that if Andrews refused to consent then she also refused to consent. Ultimately, we must view both Cynthia's and Andrews's acts as refusing consent to donate any of Steven's organs, including his corneas. After fulfilling his duty under the LOPA to request consent, Ivey voluntarily undertook to serve as an intermediary, attempting to obtain consent for the Eye Bank.
*723 Since at least 1911, Alabama has recognized a duty to "`exercise the measure of care and skill appropriate'" to all voluntary undertakings. Beasley v. MacDonald Eng'g Co., 287 Ala. 189, 193, 249 So.2d 844, 846 (1971)(quoting H.H. Parker & Bro. v. Hodgson, 172 Ala. 632, 635, 55 So. 818, 819 (1911)). This is the duty the defendants owed Cynthia and Andrews. The defendants' act of arranging for procurement went beyond the reach of the LOPA, and all other statutory guidelines, placing the defendants squarely within the realm of the common law. See Williams v. Hill, 658 So.2d 381, 383 (Ala.1995) ("Because we find that there was no statutory cause of action, we now consider whether there could be an action under the common law....").
Because we must treat both Cynthia and Andrews as having withheld consent to donate Steven's corneas, we hold that the defendants' actions in representing that Cynthia had consented and in allowing the Eye Bank to procure Steven's corneas was a breach of their duty. Thus Ivey, and derivatively, the hospital, have not shown that they are entitled to good-faith immunity. Given that the defendants essentially concede causation and some resulting damages, the trial court did not err in denying their renewed motion for a JML on this issue.

III. Jury Instructions
The defendants next present two arguments concerning the trial court's jury instructions. First, they argue that they are entitled to a new trial because the trial court refused to instruct the jury as to the applicability of the LOPA. Second, they argue that the court erred in instructing the jury on the available methods by which to record a consent to donate.

A. LOPA Instruction
At trial, the hospital, Ivey, and Strength presented to the trial court requested jury instruction numbers 27, 28, and 29, which were drawn from the LOPA but which the trial court declined to give. Although instruction number 29 is not in issue on appeal, the defendants complain of the denial of the other two requested instructions. Requested instruction number 27 consisted of the language of Ala. Code 1975, § 22-19-142(a); requested instruction number 28 consisted of the language of Ala.Code 1975, § 22-19-140(a). The record reflects that before closing arguments counsel for the hospital, Ivey, and Strength stated to the court, "We do have defendants' charges 27, 28 and 29 that we would like to file with the Court at this point in time." The trial court responded to explain how it proposed to cover the subject matter in its oral charge, and no further comments were addressed to those proposed charges at that time.
After the trial court instructed the jury, the hospital, Ivey, and Strength purported to "renew" an objection to the trial court's failure to give instructions 27 and 28, although they were in fact objecting for the first time. The defense stated:
"Finally, the defense renews objection to the Court's refusal to give charges 27 through 29, which are, again, based on the [LOPA] and the legislative intent underlying [the LOPA]. We believe [they] are correct and applicable charges."
The trial court noted and overruled the objection by the hospital, Ivey, and Strength.
"`"The ground that a jury instruction is a correct statement of law is insufficient to preserve an objection to the trial court's refusal to give the instruction."'" Vaughan v. Oliver, 822 So.2d 1163, 1177 (Ala.2001) (quoting Ex parte R.D.W., 773 So.2d 426, 429 n. 3 (Ala.2000) (quoting in turn Knight v. State, 710 So.2d *724 511, 513 (Ala.Crim.App.1997))). The objection made by the hospital, Ivey, and Strength that their requested instructions were "correct" failed to preserve the objection. Further, the additional statement that the charges were applicable "suffers the same lack of particularity" as the statement regarding the correctness of the instructions. Vaughan, 822 So.2d at 1177. Consequently, this ground of objection has not been properly preserved for appeal.

B. Instruction Regarding Telephonic Consent
The defendants also argue that Cynthia and Andrews presented only one issue before the jury: whether Cynthia actually consented to the donation of Steven's corneas. They argue that the jury should not have been called on to consider whether Cynthia's consent, if given, was in the proper form. The defendants argue that Cynthia and Andrews distanced themselves from the issue whether consent was in the correct form and argued that the dispositive issue was whether Cynthia actually did consent.
At trial, after the plaintiffs had rested their case, the hospital, Ivey, and Strength moved for a JML. In responding to this motion, Stanford Holliday, one of the counsel for the plaintiffs, stated:
"Judge, we want the record clear, please, sir, that this case boils down to the issue of whether or not Cynthia Shealey and Steven Andrews gave any consent for organ donation, not whether or not it was verbal and was it recorded properly.... We don't want this case to ever be reviewed on the issue of whether or not verbal consent is adequate."
Based on this comment, defense counsel suggested that Cynthia and Andrews stipulate that the "witnessed telephone consent [was] adequate if given." The parties did not agree to such a stipulation, however, and the court did not order such a stipulation. Consequently, the hospital, Ivey, and Strength proceeded to call and ask witnesses on direct examination whether Ivey and Strength obtained consent in the proper fashion.
During closing arguments, in the plaintiffs' rebuttal, they again stated, "We are not arguing if phone consent is okay, because they didn't consent by phone or otherwise." Intermittently in closing arguments, however, the plaintiffs implied that the method of obtaining consent was indeed an issue before the jury.
Before the trial court instructed the jury, defense counsel referred to the statement in the plaintiffs' closing arguments and requested the court to "change the jury charge to reflect that stipulation as opposed to giving them the options of which type of the various ways that consent could be taken." Plaintiffs' counsel responded, "[Y]ou can argue the facts any way you want to and it is up to the jury to decide." The trial court denied the motion of the hospital, Ivey, and Strength and stated that it would be listing "four statutory possibilities for consent," stating that the jury should determine the "factual issue."
The trial court then instructed the jury as follows:
"Under the law, as it applies to this case, either parent may give all or any part of the decedent child's body.... Any gift by a parent shall be made by, one, a document signed by the parent; two, by the parent's telegraphic message; three, by the parent's recorded telephonic message; or four, by the parent's other recorded message."
(Emphasis added.)
The defendants argue that by the previous statements made by Cynthia and Andrews's counsel, they removed from consideration *725 the issue whether consent was obtained in the proper manner. They contend that Cynthia and Andrews effectively stipulated that whether consent was givennot the manner in which it was givenwas the sole issue, and that the jury should not have been called upon to consider the technical aspects of how such consent could be obtained. Further, the argument goes, the trial court's instructions, in specifying limited methods by which the defendants could obtain consent, inserted into the case an issue not "germane" to the case.
The issue we confront is whether the plaintiffs' statements before both the trial court and the jury constituted a stipulation or a concession of the issue. We have explained that one must make a "distinct, formal solemn admission made for the express purpose of relieving [the opposing party] from establishing" an element of his claim or defense. Cook v. Morton, 254 Ala. 112, 116, 47 So.2d 471, 475 (1950). However, this Court has also found that where defense counsel in a criminal trial concedes that his client has previously been convicted of a crime, an element of the crime for which he is currently on trial, this admission "relieved the State from the burden of proving any of the matters that ordinarily would attend establishing the prior conviction." Donahay v. State, 287 Ala. 716, 718, 255 So.2d 599, 601 (1971). The Court of Criminal Appeals has discussed these two cases and their correlation, holding that, as a general rule, such admissions must be "distinct, formal, and unequivocal acts which rise to the level of an admission." Johnson v. State, 508 So.2d 1192, 1195 (Ala.Crim.App. 1986).
On the record before us, we simply cannot conclude that Cynthia and Andrews's counsel made such a "distinct, formal, and unequivocal act" that could constitute an admission. Cynthia and Andrews did not expressly stipulate that only the issue of whether consent was given would be litigated. Rather, counsel for Cynthia and Andrews would suggest in one moment that the manner of consent was irrelevant, yet, moments later, suggest that consent had been improperly obtained. Because Cynthia and Andrews's actions simply did not rise to the level of an admission, the trial court could properly regard the issue as germane; thus it did not err to reversal in denying the defendants' motion for a new trial on this ground.

IV. Excessiveness of Compensatory Damages
The defendants' final argument is that the jury verdict of $200,000 was excessive. They argue that the award was entirely attributable to damages for mental anguish, and they contend that insufficient evidence was presented at trial to support such a verdict.
It is well settled that a plaintiff may recover compensatory damages for mental anguish, even when mental anguish is the only injury visited upon the plaintiff. Kmart v. Kyles, 723 So.2d 572, 578 (Ala. 1998); Alabama Power Co. v. Harmon, 483 So.2d 386, 389 (Ala.1986). Once the plaintiff has presented some evidence of mental anguish, the question whether he should recover for such mental anguish, and, if so, how much, is a question reserved for the jury. National Ins. Assoc. v. Sockwell, 829 So.2d 111, 133 (Ala.2002); Kmart, 723 So.2d at 578. This Court views the evidence of mental anguish claimed by each plaintiff to determine if that particular person should recover; one plaintiff's mental anguish cannot bootstrap the awarding of damages to the other plaintiff or plaintiffs. Alabama Power Co. v. Murray, 751 So.2d 494, 500-01 (Ala. 1999). A jury's verdict is presumed correct, and that presumption is strengthened *726 upon the trial court's denial of a motion for new trial. 751 So.2d at 500-01. On the other hand, that presumption is weakened and we strictly scrutinize such a verdict when a plaintiff who claims damages solely for mental anguish fails to offer his own testimony of the mental anguish he has suffered. Sockwell, 829 So.2d at 133-34; Kmart, 723 So.2d at 578.
Despite our great deference to the jury's award of compensatory damages for mental anguish, we have not hesitated to remit such damages where the plaintiff has produced little or no evidence indicating that he has suffered such mental anguish. Orkin Exterminating Co. v. Jeter, 832 So.2d 25, 36-37 (Ala.2001). The inquiry is not whether traumatic events have occurred, but whether the plaintiff has actually suffered as a result of those events. 832 So.2d at 37. When a plaintiff's testimony amounts to little more than the obvious notion that dealing with the traumatic event was "hard" or "humiliating," we have consistently remitted damages. Delchamps, Inc. v. Bryant, 738 So.2d 824, 837 (Ala.1999). Additionally, when a plaintiff testifies merely that he suffered "a lot" of mental anguish, we have similarly remitted damages. Oliver v. Towns, 770 So.2d 1059, 1061 (Ala.2000); Foster v. Life Ins. Co. of Georgia, 656 So.2d 333, 336-37 (Ala. 1994).
In the case before us, however, the record is replete with testimony of the plaintiffs' mental anguish. Cynthia testified that the removal of Steven's corneas "has affected us a whole lot" and proceeded to state that she felt like someone had taken advantage of her. She testified to having dreams of Steven, yet she never sees his face anymore. In addition to her personal testimony, Dr. Kenneth Wade, her counselor, testified that the taking of Steven's corneas "greatly compound[ed] ... the difficulty of [Cynthia's] work at recovering" from Steven's death.
Andrews testified that thinking about the removal of Steven's corneas made him both angry and depressed. He felt that his depression over the cornea removal was separate from his depression over the loss of his son. Although Andrews was "glad" that two individuals were able to see as a result of the donation of Steven's corneas, that emotion did not negate or diminish his depression caused by the removal of Steven's corneas. Most striking is Andrews's testimony that he had a recurring dream that Steven sat up in his casket at the funeral, crying tears of blood. He testified that in his other recurring dream he finds himself in a hospital, where he "runs off" several doctors to find Steven on "the table." That testimony is also strong evidence of mental anguish.
With regard to both Cynthia and Andrews, we believe that the jury had enough evidence before it to award $100,000 in compensatory damages to each. We hold that each plaintiff presented substantial evidence that he or she suffered mental anguish. The fact that the trial court denied the defendants' motion for a new trial further strengthens the presumption of correctness we afford the jury's verdict. Consequently, the trial court did not err in denying the defendants' motion for remittitur and its alternative motion for a new trial.

Conclusion
The trial court did not err in denying the defendants' renewed motion for a JML. The trial court also did not err in denying either the motion for a remittitur or the motion for a new trial.
AFFIRMED.
NABERS, C.J., and JOHNSTONE and STUART, JJ., concur.
*727 SEE, J., concurs specially.
BROWN, J., recuses herself.
SEE, Justice (concurring specially).
I fully concur in the main opinion. I write only to clarify why I believe that the Alabama Medical Liability Act, Ala.Code 1975, § 6-5-480 et seq., as supplemented by § 6-5-540 et seq. ("the AMLA"), does not apply to this case.
The AMLA provides that "[a] breach of the standard of care is the failure by a health care provider to comply with the standard of care, which failure proximately causes personal injury or wrongful death." § 6-5-542(2), Ala.Code 1975. A person who is already dead cannot sustain a personal injury or be wrongfully killed. See Bauer v. North Fulton Med. Ctr., Inc., 241 Ga.App. 568, 527 S.E.2d 240 (1999); State v. Yoder, 200 Wis.2d 463, 546 N.W.2d 575 (Ct.App.1996).[3] Because a medical procedure performed on a person who is already dead cannot "proximately cause[] [the] personal injury or wrongful death" of that person, the performance of such a procedure on a person who is already dead cannot be a breach of the standard of care under the AMLA.
An individual who has "sustained either (1) irreversible cessation of circulatory and respiratory functions, or (2) irreversible cessation of all functions of the entire brain, including the brain stem, is dead." § 22-31-1, Ala.Code 1975. In the case before us, Steven Shealey was pronounced dead at 6:48 a.m., eastern standard time, after a severe asthma attack. There is no suggestion that Steven Shealey was still alive at the time of the procedure, nor is there any suggestion that the cornea procedure was related to any effort to keep him alive, to revive him, or to complete a medical procedure undertaken in such an effort or necessitated by it. The alleged injury therefore arose from a medical procedure performed on the already deceased Steven Shealey.
Because the AMLA governs claims involving personal injury or death, the standard of care found in the AMLA is not the appropriate standard of care in the case before us.
NOTES
[1] The hospital is located in Valley, Alabama, on the Alabama-Georgia border. The hospital, as well as many other locations in and around Valley, Alabama, considers itself to be in the eastern time zone. Consequently, all pertinent times will be stated according to eastern standard time.
[2] The telephone at Andrews's home had malfunctioned, and Andrews could not be reached by telephone, neither when Cynthia first took Steven to the hospital nor after Steven's death when Cynthia attempted to telephone Andrews from the hospital.
[3] I also note that "Section 6-5-462 does not permit the filing of a personal-injury claim on behalf of a person after he or she is dead." Bassie v. Obstetrics & Gynecology Assocs. of Northwest Alabama, P.C., 828 So.2d 280, 283 (Ala.2002); see also § 6-5-462, Ala.Code 1975.